UNITED STATES of America,
Plaintiff,

v.

Donald WAINWRIGHT, Sr., Defendant.

Case No. 2:14–cr–44(1).

United States District Court,
S.D. Ohio,
Eastern Division.

Filed Feb. 20, 2015.

952

J. Michael Marous, Heather Brandy Robinson, Columbus, OH, for Plaintiff.

Diane M. Menashe, Columbus, OH, for Defendant.

### *OPINION AND ORDER*

EDMUND A. SARGUS, JR., Chief Judge.

This matter is before the Court on Defendant's Motion to Dismiss Indictment (ECF No. 51) and the United States' Motion in Limine Regarding Use at Trial of Defendant's Statements Under His Proffer Agreement (ECF No. 50). The United States has also filed a Motion Instanter to Allow Reply to Defendant's Response to United States' Motion in Limine (ECF No. 57). Defendant is charged with one count of conspiracy in violation of 18 U.S.C. § 371; twelve counts of Lacey Act violations (two violations of federal law, nine violations of state law, and one labeling offense); and one count of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. For the reasons that follow, Defendant's Motion to Dismiss Indictment is **DENIED** and the United States' Motion Instanter to Allow Reply and Motion in Limine are **GRANTED.**

### I. Motion to Dismiss Indictment

#### A. Validity of Indictment

Defendant asserts that his indictment is invalid for three reasons. First, he argues that the subject White-tailed deer do not qualify as "wildlife" under the Lacey Act and thus he committed no federal offense.

Second, he asserts that the indictment fails to charge an essential element of a Lacey Act violation by not alleging that the subject deer are "wildlife" under the Lacey Act and other state provisions. And third, he presses that Counts 7 through 13 are so vague that they violate his Due Process rights.

### 1. "Wildlife"

Defendant first argues that the indictment does not set forth offenses against the United States because the subject White-tailed deer were not "wild" within the meaning of the Lacey Act. The Lacey Act makes it unlawful for any person to "import, export, transport, sell, receive, acquire, or purchase any fish or wildlife" in violation of state or federal law. 16 U.S.C. § 3372(a). "Wildlife," in turn, is defined as "any wild animal, whether alive or dead, including without limitation any wild mammal, bird, reptile, amphibian, fish, mollusk, crustacean, arthropod, coelenterate, or other invertebrate, whether or not bred, hatched, or born in captivity, and includes any part, product, egg, or offspring thereof." 16 U.S.C.A. § 3371(a). Defendant asserts that the White-tailed at issue here cannot be "wild" because they were born and have remained in captivity.

■ But the statutory text of the Lacey Act confirms that these animals are "wild" regardless of their captive origins, as it defines "wild animal" to include "without limitation, any wild mammal ... whether or not bred, hatched, or born in captivity." 16 U.S.C.A. § 3371(a); *United States v. Parrott*, No. 10–3764, at 2 (6th Cir. Sept. 16, 2011) (unpublished order) (holding deer were "wildlife" under Lacey Act even though they were domesticated because "the Act covers any wild animal, including those born and bred in captivity"). Defendant presses that this clause does not excuse an initial inquiry: whether the animal

is wild. True. But White-tailed deer *are* wild, *see Parrott*, No. 10–3764, at 2, and this clause confirms that the Court should inquire whether a species—not an individual specimen—is wild because it prevents animals that are normally found in a wild state from losing their wildness simply because they are in captivity. *See United States v. Condict*, No. CR–05–004–SPS, 2006 WL 1793235, at *3 (E.D.Ok. June 27, 2006) ("The Court finds that the term 'wildlife' as used in the Lacey Act does include 'farm raised domesticated deer.' This is supported by the language of the Lacey Act itself, which clearly indicates that otherwise wild animals do not cease to be wildlife simply because they or their progeny are no longer found in the wild."). If Congress meant for an individual animal's captive upbringing to matter, it would not have instructed the Court to ignore it. *See United States v. Bernal*, 90 F.3d 465, 467 (11th Cir.1996) (per curiam) (rejecting as "wholly meritless" the argument that "wildlife" as used in the Lacy Act does not apply to animals bred in captivity); *see also United States v. Delaney*, 795 F.Supp.2d 125, 127–28 (D.Mass. 2011).

### 2. Essential Element of the Crime

■ Defendant also argues that the indictment fails to charge an essential element of the crime: that domesticated white-tailed deer are wild such that they are covered by the Lacey Act and other state provisions. But even assuming that the Government needed to plead that the specimen in question were wild, this argument is not well-taken. In each count alleging a Lacey Act violation, the indictment alleges that the subject deer were wild. By alleging that the White-tailed deer is "wildlife," the indictment sufficiently alleges that the specimen is wild because the Lacey Act defines "wildlife" to

include "any wild animal." *See* 16 U.S.C. § 3371(a).

### 3. Counts 7 Through 13

■ Defendant also presses that the description in the indictment of Counts 7 through 13 are so vague that it violates the principles of due process. The Due Process Clause imposes two requirements on an indictment. First, it must "contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Second, it must "enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.*

■ Defendant claims these counts present insufficient detail, first pointing out the indictment does not provide specific dates for the hunts listed. Yes, only Count 8 specifically lists a date of December 12, 2012. But the remaining counts provide a month and a year, and this provides sufficient notice of the conduct charged. *See United States v. Younes*, 194 Fed.Appx. 302, 309 (6th Cir.2006) (holding indictment sufficient where it "specified a month, or in some cases a day, when each of the overt acts occurred").

Next, Defendant objects that his name is not listed as a hunter on the alleged dates, as well as the fact that only the hunters' initials are alleged.[1] But Defendant is not charged with illegal hunting. Rather, he is charged with trafficking animals in interstate commerce in violation of Ohio's requirement that any person operating a wild animal preserve must have a license. *See* Ohio Rev.Code § 1533.721(A). Thus, the Government alleges that Defendant's

operating the preserve, not his hunting, is criminal. And, because he allegedly organized and operated the hunts, Defendant has sufficient means to know what hunters these initials represent. Further, Defendant could seek additional details through a motion for a bill of particulars.

Defendant also notes that Counts 7 through 13 do not specify the location of the offenses. But the general allegations in the indictment establish that Defendant operated a White-tailed deer hunting facility at a particular address, and that he once had an Ohio license to operate a wild animal hunting preserve that lapsed. (Indictment at 1–2.) Moreover, Counts 7 through 13 allege that the charged conduct occurred in the Southern District of Ohio, and in violation of an Ohio statute requiring a licensing permit. The Court therefore concludes that Defendant has sufficient information to know the conduct of the charges.

■ Last, Defendant seeks dismissal on the grounds that the predicate state law "has nothing to do with interstate or foreign commerce" and that "no information in the indictment ... alleges there was any interstate or foreign commerce involvement." (Mot. at 15; ECF No. 51.) But the Lacey Act does not require that that the state-law violation relate to interstate commerce. *See* 16 U.S.C. § 3372(a)(2)(A). Rather, it makes it "unlawful for any person to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce" wildlife that that is in violation of any state law. *Id.* The indictment here alleges the requisite interstate element, as it alleges that Defendant engaged in the "transporting, selling, receiving, acquiring, and/or purchasing" White-tailed deer, "in inter-

---

1. Insofar as the actual hunters here have not been charged, the use of initials prevents the inclusion of a full name of a person not under indictment, which is no doubt a sound exercise of prosecutorial discretion.

state commerce," knowing that the "wildlife was taken, possessed, transported, and/or sold" in violation of Ohio's statute on licensing of wild animal hunting preserves. (Indictment at 14–15.)

In sum, the Court concludes that the indictment sufficiently pleads federal crimes.

### B. Vagueness

Next, Defendant asserts application of the Lacey Act violates the constitutional prohibition against vague and overbroad laws and that it provides no notice of what conduct is considered illegal. Specifically, Defendant argues that the Lacey Act is void for vagueness and unconstitutionally overbroad. Defendant then raises these same issues with Ohio Revised Code § 1533.721.

#### 1. Lacey Act

■ Defendant presses that if his definition of "wild animal" is not adopted, "then the entire Lacey Act statute must be invalidated." (Mot. at 16.) "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

■ The Lacey Act provides sufficient definiteness. Congress may legislate "in general and qualitative, rather than encyclopedic terms," and may employ a "normative principle," even if such principle "may at times be more difficult for courts to implement." *Sykes v. United States,* — U.S. —, 131 S.Ct. 2267, 2277, 180 L.Ed.2d 60 (2011). Ordinary people can understand that a White-tailed deer is a "wild animal" and that therefore the Lacey Act prohibits trafficking White-tailed deer

in violation of federal or state law. *Mileski v. Washington,* 468 Fed.Appx. 585, 587 (6th Cir.2012) (rejecting vagueness challenge because "the statute applies to [the defendant's] own conduct clearly enough"). Indeed, the Lacey Act has repeatedly been held to unambiguously give notice of its proscribed conduct and to provide the "reasonable degree of certainty" necessary to withstand a challenge that it fails to do so. *See United States v. Bryant,* 716 F.2d 1091, 1095 (6th Cir.1983) (holding Lacey Act was not unconstitutionally vague); *United States v. Lee,* 937 F.2d 1388, 1395 (9th Cir.1991); *United States v. 594,464 Pounds of Salmon,* 871 F.2d 824, 829 (9th Cir.1989) ("[T]he Act is not unconstitutionally vague.").

■ Defendant also asserts that the Lacey Act is "unconstitutionally overbroad." (Mot. at 18–19.) But the overbreadth doctrine "is applicable only in First Amendment Cases" and if a statute does not implicate the First Amendment, "then a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *United States v. Blaszak,* 349 F.3d 881, 888 (6th Cir.2003) (internal quotation marks omitted). Because the Lacey Act does not implicate the First Amendment and may be constitutionally applied to Defendant, "he is precluded from basing his overbreadth challenge on the possibility that the statute could be unconstitutionally applied to others." *See id.*

#### 2. Ohio Rev.Code § 1533.721

■ Defendant also asserts that Ohio Revised Code § 1533.721 does not provide notice of what conduct is considered illegal. The Court disagrees. That statute prohib-

its any person from operating a "wild animal hunting preserve" without a license. Ohio defines a "wild animal hunting preserve" as "an area of land where game, captive white-tailed deer, and nonnative wildlife ... are released and hunted." Ohio Rev.Code § 1531.01(FFF). "Game" is defined to include "game quadruped," Ohio Rev.Code § 1531.01(R), and "game quadrupeds" includes "white-tailed deer." Ohio Rev.Code § 1531.01(V). Thus, Ohio law prohibits any person from operating an area of land where White-tailed deer are released and hunted without a license.

Defendant also asserts that the term "wild animal" is unconstitutionally vague. But White-tailed deer unquestionably qualify as "wild animals" under Ohio law. "Wild animals" is defined to include "wild quadrupeds." Ohio Rev.Code § 1531.01(X). "Wild quadrupeds" is defined to include "game quadrupeds." Ohio Rev.Code § 1531.01(U). And "game quadrupeds" includes "white-tailed deer." Ohio Rev.Code § 1531.01(V).

In sum, the Court concludes that these statutes are constitutional.

## C. Double Jeopardy

Last, Defendant charges that the indictment is multiplicitous. "Multiplicity is charging a single offense in more than one count in an indictment." *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir.2008) (internal quotation marks omitted). "To determine if multiplicity exists, a court must first look to whether Congress intended to punish each statutory violation separately." *Id.* Defendant, noting that certain counts revolve around a single act, argues that "there is no evidence that suggests Congress intended to provide multiple punishments for a single act." (Mot. at 21.) But Defendant points to no contrary evidence, and where "this enquiry does not resolve the issue, the general test for compliance with the double jeopardy clause looks to 'whether *each* provision requires proof of a fact which the other does not.'" *Id.* Here, each count requires proof that the others do not. *Cf. United States v. Ehle*, 640 F.3d 689, 697 (6th Cir.2011) (holding that where defendant's two convictions constituted the same offense, "there is a rebuttable presumption that Congress did not intend to impose two punishments for the offense").

Counts 2 and 3 describe identical conduct alleged to have taken place on April 15, 2010. But, Count 2 alleges that Defendant trafficked White-tailed deer in violation of 9 C.F.R. § 77.27, and thus violated 16 U.S.C. § 3372(a)(1), which prohibits wildlife trafficking in violation of a federal law. Count 3, by contrast, charges Defendant with violating Florida Administrative Code 5C–26.003, and thus violating 16 U.S.C. § 3372(a)(2)(A), which prohibits wildlife trafficking in violation of state law. Thus, Count 2 requires proof of a violation of federal—not state—law, while Count 3 requires proof of violation of a state—not federal—law. If Defendant is convicted of both, the Court reserves the question of whether both convictions may stand. *See Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985).

Similarly, Counts 4, 5, and 6 pertain to one alleged action. But again, Count 4 alleges trafficking in violation of federal law, Count 5 alleges wildlife trafficking in violation of state law, and Count 6 alleges that Defendant falsely labeled wildlife that had been or was intended to be transported across state lines. So, Count 4 is the only count requiring proof of a violation of federal law, Count 5 is the only count requiring proof of a state-law violation, and Count 6 is the only charge requiring proof of false labeling. If Defendant is convicted of all three counts, the Court

reserves the question of whether both convictions may stand.

For these reasons, the Court denies Defendant's Motion to Dismiss Indictment.

## II. Motion in Limine

Before the grand jury returned the indictment in this case, counsel for Defendant and for the Government communicated about the investigation and pending prosecution. These discussions led to a proffer session. The Government provided a proffer agreement that defined the terms of the proffer session, and Defendant, his counsel, and counsel for the Government all signed it. The key provisions of the agreement include:

> *First:* No statements made, or other information provided, by your client during the "off-the-record" proffer or discussion will be used against your client in any civil or criminal case, except as provided in paragraphs 2 through 4.
>
> \* \* \*
>
> *Third:* The government will be free to use any statements provided by your client or any information derived directly or indirectly from these statements for impeachment, cross-examination and rebuttal in any future proceedings. However, the government will not use any statements made in the "off-the-record" proffer as a basis for prosecution for earlier statements from your client pertaining to this case. In other words, the government would expect that future statements or testimony would be consistent with statements made in the proffer.

Now, the Government seeks a conditional evidentiary ruling that Defendant's proffer statements will be admissible if Defendant or Defendant's counsel "make or present any evidence, factual assertions, or arguments that are explicitly or inferen-

tially inconsistent with the proffered statements." (Mot. at 3; ECF No. 50.)

 The agreement establishes a background principle that that no proffer statement is admissible unless it falls under an exception established by paragraphs 2 through 4. The dispute here centers on the exception carved out by paragraph 3: the Government may use any proffer information "for impeachment, cross-examination and rebuttal in any future proceedings." In interpreting this agreement, the Court employs the traditional tools of contract interpretation. *See United States v. Fitch,* 964 F.2d 571, 574 (6th Cir.1992).

### 1. Federal Rules of Evidence

 Defendant argues that his proffer statements may not be used because of Federal Rule of Evidence 410. That rule ordinarily bars admission of statements made during plea discussions that do not result in a guilty plea. *See* Fed.R.Evid. 410(a)(4); *see also* Fed. R.Crim.P. 11(f). But this rule's protection may be waived by a defendant who does so knowingly and voluntarily. *See United States v. Mezzanatto,* 513 U.S. 196, 210, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995). Defendant, along with his counsel, waived any objection under Rule 410 by agreeing to the Government's use of "any statements" made in the proffer session "for impeachment, cross-examination and rebuttal in any future proceedings." True, the agreement does not specifically identify the rule that Defendant waived. But allowing the government to use proffered statements in certain circumstances is unquestionably a conditional waiver of Rule 410's protection. *See United States v. Moro,* No. CR. 09–137, 2010 WL 3810041, at *2 (D.N.J. Sept. 22, 2010) ("[T]he terms of Moro's proffer agreements allow the government to "cross examine [him] and to rebut any evidence or arguments offered

on [his] behalf." This is a waiver of Federal Rule of Evidence 410's protections.") (citation omitted). And, courts do not require that the proffer agreement specifically list Rule 410 to waive its protection. *See United States v. Roberts*, 660 F.3d 149, 157 (2d Cir.2011) (rejecting argument that Rule 410 barred statements where agreement allowed the government to use statements to "rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant] at any stage of a criminal prosecution"); *see also United States v. Krilich*, 159 F.3d 1020, 1024 (7th Cir.1998) (finding waiver where agreement used similar language).

### 2. Scope of the Agreement

The Government asks the Court to rule that Defendant's proffer statements would be admissible as substantive evidence if: (1) Defendant testifies at trial in a manner inconsistent with the proffer statements; (2) Defendant presents any exhibits, witnesses, or other evidence that are inconsistent with the proffer statements; (3) defense counsel's cross-examination of government witnesses attempts to elicit testimony that is inconsistent with the proffer statements; and (4) defense counsel makes any statement in opening statement that is inconsistent with the proffer statements.

All agree that the Government may introduce Defendant's proffer statements if he testifies inconsistently at trial. (*See* Resp. at 7, 10, 11; ECF No. 53.) Thus, if Defendant testifies inconsistently, the Government may introduce Defendant's proffer statements.

■ Defendant challenges whether the Government's second, third, and fourth proposed uses of the proffer statements are within the scope of the proffer agreement. Defendant's agreement provides that the Government may use the proffer statements for "impeachment, cross-examination and rebuttal in any future proceeding." The Government's proposed uses of Defendant's proffer statement can fall within this language. This, however, is a determination that depends heavily on context. Therefore, the Government may not freely introduce Defendant's proffer statements whenever it sees fit. Rather, before any proffer statement is used at trial in these circumstances, the Government must first seek permission from the Court by asking for a sidebar where it can explain the basis for offering the proffer statements.

Resisting this conclusion, Defendant asserts that the agreement allows the introduction of his proffer statements only if and when he testifies inconsistently at trial. But the language allows the Government to generally use the statements "for ... rebuttal in any future proceedings." Similar language has been employed to allow proffer statements beyond scenarios where the defendant testifies inconsistently. *See United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir.2008) (allowing proffer statements where defendant's counsel attempted to elicit testimony on cross-examination that was inconsistent with the proffer statement); *United States v. Dortch*, 5 F.3d 1056, 1068 (7th Cir.1993) (allowing proffer statement to impeach a defense witness).

Defendant argues that these cases provide no guidance, highlighting that they involved proffer agreements with specific terms not found in the agreement here. *See, e.g. Hardwick*, 544 F.3d at 570 (allowing Government "to rebut *any* evidence or arguments offered on [defendant's] behalf"); *Dortch*, 5 F.3d at 1068 (allowing proffer statements to "rebut evidence or arguments materially different from" the proffer statements). True, these agree-

ments were more particular in that they defined what was being rebutted: evidence or arguments. But that particularity does not make the agreement here substantively different. Defendant's agreement allows for his statements to be used "for ... rebuttal in any future proceedings" and what the parties would "rebut[ ]" in "proceedings" are evidence and arguments.

Paragraph 3 in the proffer agreement, according to Defendant, also shows that proffer statements may be used only if and when Defendant testifies inconsistently. After allowing the government to use the proffer statements "for impeachment, cross-examination and rebuttal in any future proceedings," the agreement goes on to state:

> However, the government will not use any statements made in the "off-the-record" proffer as a basis for prosecution for earlier statements from your client pertaining to this case. In other words, the government would expect that future statements or testimony would be consistent with statements made in the proffer.

But neither sentence limits the Government's use of the proffer statements to when Defendant testifies. And, neither limits the Government's ability to use the proffer statements for "rebuttal in any future proceedings." Rather, the first sentence merely prevents the Government from using the proffer statements in one instance not applicable here, while the second sentence expresses the government's expectation that there will not be a future proceeding requiring "impeachment, cross-examination and rebuttal."

Last, Defendant asserts that the "rebuttal" language in the agreement allows the Government to present rebuttal witnesses only if he testifies inconsistently with his proffer statements. But "rebuttal" includes "[i]n-court contradiction of an ad-

verse party's evidence." Black's Law Dictionary (9th ed.2009). While this often happens after the defendant puts forth evidence and argument in his own case, there are occasions where the Government may rebut during its case in chief. *See, e.g., Hardwick,* 544 F.3d 565, 570–71 (3d Cir.2008) (allowing proffered statements where defense counsel cross-examined government witness aiming to elicit inconsistent testimony); *United States v. Barrow,* 400 F.3d 109, 118–20 (2d Cir.2005) (holding "[f]actual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly f[e]ll within [the agreement's] broad language").

## III. CONCLUSION

For the reasons outlined above, Defendant's Motion to Dismiss Indictment (ECF No. 51) is **DENIED** and the United States' Motion Instanter to Allow Reply (ECF No. 57) and Motion in Limine (ECF No. 50) are **GRANTED.** The Government must first seek Court approval at a sidebar for the use of a proffer statement for any reason other than Defendant testifying inconsistently.

**IT IS SO ORDERED.**